Ford A. Kalil v. Commissioner. John Kalil v. Commissioner,
Kalil v. Commissioner
Docket Nos. 56793, 56794.
United States Tax Court
T.C. Memo 1958-70; 1958 Tax Ct. Memo LEXIS 164; 17 T.C.M. (CCH) 342; T.C.M. (RIA) 58070; April 22, 1958
*164 Ellsworth T. Simpson, Esq., 1000 Vermont Avenue, N.W., Washington, D.C., for the petitioners. W. Preston White, Jr., Esq., for the respondent. KERN
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies and additions to tax in the petitioners' income taxes, as follows: Docket No. 56793, Ford A. Kalil
Additions to tax
Section 293(b),
Year
Deficiency
I.R.C. 1939
1942
$ 2,735.89
$ 1,367.95
1943
8,364.48
4,182.24
1944
59,887.06
29,943.53
Docket No. 56794, John Kalil
1942
$ 2,751.81
$ 1,375.91
1943
7,344.54
3,672.27
1944
57,518.12
28,759.06
Practically all of the deficiencies result from respondent's determination that the distributive share of income of each petitioner from a partnership known as Kalil Brothers was understated in his returns for the years 1942, 1943, and 1944 in the respective amounts of $9,438.83, $16,663.67, and $79,327.73. [1] Each of the petitioners reported income from this source in those 3 years in the respective amounts of $3,840.85, $6,681.73, and $12,630.24. The parties are in general agreement that income from this source was understated by petitioners in *165 large amounts. Therefore, the principal issues for our decision herein are: (1) Whether any part of the deficiency for each of the taxable years was due to fraud with intent to evade tax, and (2) whether the assessment of any of the deficiencies here involved is barred by the statute of limitations. Findings of Fact Many of the facts are stipulated. The stipulation and the exhibits annexed thereto are incorporated herein by this reference. These cases were consolidated for trial and opinion. The petitioners, Ford A. Kalil and John Kalil, are brothers. During the taxable years ended December 31, 1942 to 1944, inclusive, they owned and operated a partnership business known as Kalil Brothers or Kalil Brothers Liquor Stores, sometimes hereinafter referred to as the partnership, in Live Oak, Florida. This partnership owned and operated five or six package liquor stores in Live Oak. The petitioners and their partnership filed their Federal income tax returns for the taxable years with the collector of internal revenue for the district of Florida. The partnership business was formed on July 1, 1941. During *166 the taxable years here involved, the partnership derived and realized taxable income from the operation of retail liquor stores, sales of whisky in excess of the Office of Price Administration ceiling prices, and the sales of whisky in the black market. The petitioners' principal source of income during these years was from the partnership business. Prior to 1939 they had not received sufficient income to require the filing of income tax returns. Prior to the year 1942 the petitioners had not received any inheritances, with the exception of about $800 or $900 from their father. Petitioners were equal partners in the business. From May 1943 to December 1944 the partnership employed T. M. Smiley, Jr., an employee of The First National Bank of Live Oak, Florida, as a part-time bookkeeper. Smiley worked under the supervision of Ford and spent on the average of about 1 hour a day doing bookkeeping work for the partnership. When Smiley was unable to do this work for the partnership because of his regular employment, the bookkeeping work was done by Ford. The partnership's financial records were maintained under the single-entry method in one large book. Bank accounts were maintained in *167 the names of "Kalil Brothers, Liquor Store Account," "Kalil Bros. Building Acct.," "Mr. or Mrs. Johnnie Kalil," "Johnnie Kalil Personal Account," "F. A. Kalil Personal," "Mr. or Mrs. F. A. Kalil," and "F. A. and Johnnie Kalil, Special Account." The bank accounts of the partnership were handled by the petitioners, who made all of the withdrawals and deposits. There were deposited in the partnership bank account "Kalil Brothers, Liquor Store Account" during the years 1942, 1943, and 1944 the respective amounts of $185,128.84, $212,907.48, and $240,949.72. Of the deposits made in 1942, $106,315.97 was in cash while in 1943 and 1944 the cash deposits were in the respective amounts of $140,633.20 and $160,937.32. Smiley had access to the partnership bank statements and canceled checks. He posted into the partnership book of accounts information which he obtained from invoices and sales slips of the partnership business which were placed by one of the petitioners in a wire basket in the partnership's office for this purpose. The financial records kept by Smiley consisted of a record of sales, purchases, salaries, and operating expenses, all of which were entered in the one book and totaled *168 monthly. In posting sales he obtained his information from sales slips prepared by the managers and cashiers of the petitioners' several businesses. All were posted on a weekly basis except one which was posted on a daily basis. Smiley did not consider that the financial records kept by him served as complete and adequate books of account for the partnership since there was no control account, since it was difficult to reconcile bank statements, and since it was impossible to prepare a balance sheet. He made this fact known to Ford shortly after he became the partnership's part-time bookkeeper. At that time Ford stated that all he wanted was a record of the information which had been given to Smiley and that the bookkeeping system, as such, met his requirements. Neither petitioner instructed Smiley to make any entry which Smiley knew to be false. The partnership's books and records were inadequate and did not reflect a true picture of the business. The partnership income tax returns for the taxable years 1942 and 1943 were prepared by C. E. Stich from information submitted to him by one of the petitioners. Stich charged $5 for the preparation of each return and was not called upon *169 to make an audit of the partnership business. During the war years qualified bookkeepers were difficult to obtain, and in Live Oak there were no practicing certified accountants. Part-time bookkeeper Smiley left the petitioners' employ in December 1944 to enter the armed services. In the latter part of January or early February 1945, Ford went to Jacksonville, Florida, accompanied by the president of The First National Bank of Live Oak who recommended and introduced Ford to Joseph C. Hartman, a certified public accountant. Ford requested Hartman to prepare the petitioners' income tax returns for the year 1944. Hartman accepted this employment and he and one of his employees, A. J. Johnson, traveled to Live Oak for the purpose of obtaining the books and records of the petitioners in order that they might prepare their returns. Johnson made numerous trips to Live Oak in the course of preparing these income tax returns. He also obtained a 60-day extension for filing the petitioners' returns for 1944. While preparing these returns, Hartman discovered that the petitioners had failed to claim depreciation for 1942 and 1943 and accordingly proceeded to correct this condition for 1945. Hartman *170 and Johnson did not make an audit, but merely accepted the figures contained in the single-entry book kept by the petitioners and in other papers available in the partnership office. They did write some letters and make some telephone calls with respect to some transactions between the partnership and the American Distilling Co. with regard to the partnership's purchases of some of that company's stock and correlated purchases of whisky. Hartman's fee for preparing and filing these returns was $525. After preparing the returns, Hartman asked the petitioner Ford if all income received was included in the tax returns and Ford advised him that it was. After the 1944 return was prepared the petitioners employed Hartman to set up a proper bookkeeping arrangement for the partnership. A fee of $900 was charged for this work. Following an examination of the partnership's records by one of the respondent's examining officers, Hartman detailed Johnson to investigate some of the partnership's transactions for the taxable years. His work disclosed that the partnership had received more income than had been reported during the taxable years. In January 1946 Johnson left Hartman's employ and went *171 to work as the accountant for the partnership. In 1944 the petitioners told two investigators of the Federal Alcohol and Tobacco Tax Unit that they were guilty of violating O.P.A. regulations, explaining that due to the large investment in the partnership they could not make a commensurate profit on the 33 1/3 per cent markup allowed by the O.P.A. During their investigation they also learned that the partnership had purchased, in 1943, 1,500 cases of Tom Burns whisky for $35,550, of which 500 cases had been sold for cash in a transaction of which the bookkeeper Smiley had no knowledge. In 1944 the partnership made a compromise settlement with the O.P.A., paid an $8,000 fine, and agreed to a permanent injunction enjoining them forever from violation of O.P.A. regulations. The petitioners subsequently violated this injunction and were fined for contempt. The respondent's investigation of the partnership began after the return for the taxable year 1944 had been filed. It was after Revenue Agent Frambrough had contacted the petitioners concerning their returns for the taxable years that Johnson was detailed to make "somewhat of an audit of the partnership's transactions for the taxable *172 years * * *." In the fall of 1945, Special Agent Ehringer was assigned to investigate the petitioners' income tax liabilities for the taxable years which he commenced with Frambrough's assistance. They obtained a statement from Smiley, examined the ledger sheets, deposit tickets, and other records, and interviewed petitioner Ford. Ehringer left the Internal Revenue Service in July 1946, and at that time he turned over all his working papers on the petitioners' case to Special Agent Shellan, who was assigned to follow him on the investigation. Shellan examined income tax returns, bank statements, canceled checks, invoices, testimony of witnesses, public records, and Frambrough's working papers, in order to determine the petitioners' income tax liabilities on the increase in net worth method of reconstructing income. He also made a detailed analysis of the bank accounts of both the partnership and the petitioners. He did not examine the partnership's singleentry book of accounts for the reason that Frambrough had determined that it was inadequate and incomplete and, therefore, did not know in what respects, if any, the books of petitioners were inaccurate. On October 17, 1947, after *173 his investigation was substantially complete, Shellan was furnished with Johnson's working papers which themselves showed that the partnership had received substantial unreported income during the taxable years. Shellan did not find any concealment of assets by petitioners. In 1951 Ford A. Kalil was found not guilty in the United States District Court on some undisclosed criminal charge involving allegations of fraud in connection with income taxes for the years 1942, 1943, and 1944. The correct amounts of the partnership income for the taxable years, computed on the basis of increases in net worth, corroborated by analyses of bank deposits, were as follows: 1942
$ 19,414.94
1943
37,228.20
1944
108,055.91
In the partnership returns for the taxable years the net income of the partnership was reported as follows: 1942
$ 7,681.70
1943
13,363.44
1944
25,230.43
During the taxable years 1944 the petitioners sold common stock of American Distilling Co. at a loss of $26,197.26. The difference in the cost of the stock and its selling price constitutes a part of the cost of the whisky since, in order to obtain the whisky, they were required to *174 purchase the common stock. The distributive share of the partnership income, the amount reported, and the understatement of income from this source of each petitioner for the taxable years were as follows: One-half
partnership
Income
Income
Year
income
reported
unreported
1942
$ 9,707.47
$ 3,840.85
$ 5,866.62
1943
18,614.10
6,681.73
11,932.37
1944
54,027.95
12,630.24
41,397.71
Part of the deficiencies for each of the taxable years was due to fraud with intent to evade taxes. The income tax returns filed by each of the petitioners for the taxable years were false and fraudulent with intent to evade tax. Opinion KERN, Judge: The parties are in practical agreement with regard to the amounts of unreported income of petitioners for the taxable years. It is not disputed that the books of petitioners' partnership do not accurately reflect its income or that the correct income of the partnership (and the derivative income to each of the petitioners) was in at least the amounts set out in our findings. These amounts result from computations of increases in the net worth of the partnership as corroborated by an analysis of its bank deposits. *175 However, for the year 1944 respondent contends that there should be added to the figure reflecting the increase in net worth for that year an amount of $28,866.48 representing all of the net shortterm capital losses of the partners for that year. The propriety of respondent's action is challenged with regard to this adjustment in that petitioners contend that $26,197.26 thereof in reality constituted additional cost of whisky. While the proof with regard to this item is not entirely satisfactory, we have concluded that petitioners are correct in this contention. See Western Wine & Liquor Co., 18 T.C. 1090; Charles A. Clark, 19 T.C. 48. Also, it is obvious, as recognized in the stipulation, that capital losses are limited only "to the extent of $1,000 to each petitioner." Therefore the amount to be added to the net worth figure for 1944 should not be in excess of $669.22. Even with this adjustment in petitioners' favor, there have been understatements of partnership income amounting to over 100 per cent in 1942 and 1943 and over 200 per cent in 1944. During the taxable years the partnership sold merchandise at overceiling prices in violation of the regulations *176 of the O.P.A. and in violation of a court order. No explanation was given by petitioners as to the gross understatements of the partnership income during the taxable years. Only one of the petitioners testified and he was not asked to give, and did not give, an explanation accounting for such understatements. In Lillian Kilpatrick, 22 T.C. 446, 458, we said: "Repeated gross understatements of income without an adequate explanation, even over a period of a few years, are evidence of fraudulent intent * * *." In the instant case the explanation was not simply inadequate, it was nonexistent. Accordingly, we reject petitioners' principal contention, that there has been a failure of proof by respondent upon whom is the burden, with regard to fraud. Petitioners stress the fact that they employed a certified public accountant to prepare the returns for the year 1944. However, it is apparent that they furnished him information which was incomplete and inadequate under circumstances which compel us to believe that they knew it to be incomplete and inadequate. Upon the issues having to do with the additions to tax and the running of the statute of limitations we decide in *177 favor of respondent. Decisions will be entered under Rule 50. Footnotes
1. In the case of Ford A. Kalil the amounts for 1942 and 1944 are 1 cent greater.↩